United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8            IN THE UNITED STATES DISTRICT COURT
9          FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
11  In re DEEP VEIN THROMBOSIS          MDL Docket No 04-1606 VRW
    LITIGATION
12                                               ORDER
13  This Document Relates To:
14  WARSAW CASES
15  02-1693    04-0875    05-0369
    02-2997    04-1022    05-0381
16  02-5213    04-1092    05-1131
    03-0344    04-1807    05-1320
17  03-1929    04-3831    05-1733
    03-2181    04-3953    05-1790
18  03-3242    04-4322    05-1895
    03-3637    04-4527    05-2476
19  03-3842    04-4700    05-2493
    03-4102    04-4870    05-2608
20  03-4830    04-4872    05-2748
    03-5538    04-4896    05-2592
21  04-0487
                                    /
22
23          Deep vein thrombosis (DVT) is a medical condition that
24  occurs when a thrombus (a blood clot) forms in a deep vein, usually
25  in the extremities of the leg.  DVT can lead to serious injury or
26  death if the thrombus breaks off and lodges in the brain, lungs or
27  heart, thereby causing a heart attack, stroke or other debilitating
28  effects.  Studies indicate a link between air travel and DVT, which

United States District Court

For the Northern District of California

can be attributed to relatively prolonged periods of immobility coupled with low cabin pressure and poor oxygenation (technically, "hypobaric hypoxia").  Plaintiffs in this litigation suffered (or sue on behalf of an individual who suffered) from DVT-related injuries during or after travel aboard commercial aircraft.

On June 25, 2004, the Judicial Panel on Multidistrict Litigation centralized pre-trial proceedings in cases involving "complex core questions concerning whether various aspects of airline travel cause, or contribute to, the development of deep vein thrombosis in airline passengers." Doc #1 at 2.  Ultimately, all transferred actions were assigned to the undersigned.  On February 14, 2005, the court granted summary judgment in favor of Boeing in its capacity as manufacturer of the aircraft in question in 17 cases.  Doc #144, 356 F Supp 2d 1055 (ND Cal 2005).  All claims against airline defendants arising from domestic flights have been dismissed pursuant to the federal preemption rationale announced in the court's order of March 11, 2005.  Doc #151, 2005 WL 591241 (ND Cal Mar 11, 2005).  See also Witty v Delta Air Lines, Inc, 366 F3d 380 (5th Cir 2004).

There are approximately 50 cases pending in MDL 1606 in which plaintiffs allege that they suffered from DVT-related injuries during or after international flights ("Warsaw cases"). Before the court are motions for summary judgment filed by airline defendants in 37 Warsaw cases.  Doc ##277, 283, 291, 294, 296, 302, 307, 312, 317; Doc #28 (04-0487); Doc #17 (05-0369).  For reasons discussed below, defendants' motions are GRANTED.

//

//

2

1

I

2      "Once a properly documented motion has engaged the gears

3 of Rule 56, the party to whom the motion is directed can shut down

4 the machinery only by showing that a trialworthy issue exists."

5 McCarthy v Northwest Airlines, Inc, 56 F3d 313, 315 (1st Cir 1995).

6 That is, the court must determine whether genuine issues of

7 material fact exist, resolving any doubt in favor of the party

8 opposing the motion.  "Only disputes over facts that might affect

9 the outcome of the suit under the governing law will properly

10 preclude the entry of summary judgment."  Anderson v Liberty Lobby,

11 Inc, 477 US 242, 248 (1986).  Further, "summary judgment will not

12 lie if the dispute about a material fact is 'genuine,' that is, if

13 the evidence is such that a reasonable jury could return a verdict

14 for the nonmoving party."  Id.  And the burden of establishing the

15 absence of a genuine issue of material fact lies with the moving

16 party.  Celotex Corp v Catrett, 477 US 317, 322-23 (1986).  Summary

17 judgment is granted only if the moving party is entitled to

18 judgment as a matter of law.  FRCP 56(c).

19      The nonmoving party may not simply rely on the pleadings,

20 however, but must produce significant probative evidence, by

21 affidavit or as otherwise provided in FRCP 56, supporting its claim

22 that a genuine issue of material fact exists.  TW Elec Serv, Inc v

23 Pacific Elec Contractors Ass'n, 809 F2d 626, 630 (9th Cir 1987).

24 The evidence presented by the nonmoving party "is to be believed,

25 and all justifiable inferences are to be drawn in his favor."

26 Anderson, 477 US at 255.  "[T]he judge's function is not himself to

27 weigh the evidence and determine the truth of the matter but to

28 determine whether there is a genuine issue for trial."  Id at 249.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1    The evidence presented by both parties must be

2  admissible.  FRCP 56(e).  Conclusory, speculative testimony in

3  affidavits and moving papers is insufficient to raise genuine

4  issues of fact and defeat summary judgment.  <u>Thornhill Publishing</u>

5  <u>Co, Inc v GTE Corp</u>, 594 F2d 730, 738 (9th Cir 1979).  Hearsay

6  statements in affidavits are inadmissible.  <u>Japan Telecom, Inc v</u>

7  <u>Japan Telecom America Inc</u>, 287 F3d 866, 875 n 1 (9th Cir 2004).

8

9                              II

10                             A

11    The United States adheres to the Convention for the

12  Unification of Certain Rules Relating to International

13  Transportation by Air, concluded at Warsaw, Poland, October 12,

14  1929, popularly referred to as the "Warsaw Convention."  49 Stat

15  3000, reprinted in note following 49 USC § 40105.  The purposes of

16  the Warsaw Convention are two-fold:  "providing uniformity in

17  respect to documentation and certain procedural matters, and

18  imposing limitations on liability."  <u>In re Aircrash in Bali,</u>

19  <u>Indonesia on April 22, 1974</u>, 684 F2d 1301, 1307 (9th Cir 1982).

20  See also <u>Maugnie v Compagnie Nationale Air France</u>, 549 F2d 1256,

21  1259 (9th Cir 1977) ("[T]he Convention functions to protect

22  passengers from the hazards of air travel and also spreads the

23  accident cost of air transportation among all passengers.").

24    "[R]ecovery for a personal injury suffered on board an

25  aircraft or in the course of embarking or disembarking, if not

26  allowed under the Convention, is not available at all."  <u>El Al</u>

27  <u>Israel Airlines, Ltd v Tseng</u>, 525 US 155, 161 (1999) (quotations

28  and citation omitted).  No plaintiff disputes that the injury he or

4

she sustained (DVT and resultant complications) was triggered during "international transportation" for purposes of Article 1(2). Nor does any plaintiff dispute that the Warsaw Convention applies and preempts all claims arising under local law.  Accordingly, plaintiffs can recover from air carriers, if at all, only within the framework established by the Warsaw Convention.

> Article 17 of the Warsaw Convention provides:
>
> The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the <u>accident</u> which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

49 Stat 3018 (emphasis added).

In other words, as explained by the Supreme Court in <u>Air France v Saks</u>, 470 US 392 (1985), a carrier "is liable to a passenger under the terms of the Warsaw Convention only if the passenger proves that an 'accident' was the cause of her injury."  Id at 396.

In <u>Saks</u>, the Supreme Court defined "accident" for purposes of Article 17 as "an unexpected or unusual event or happening that is external to the passenger."  Id at 405.  "This definition should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries."  Id.  And because any injury "is the product of a chain of causes," a plaintiff need only show that "some link in the chain was an unusual or unexpected event external to the passenger."  Id at 406.

When, however, "the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident, and Article 17 of the Warsaw Convention cannot apply."

United States District Court

For the Northern District of California

5

United States District Court

For the Northern District of California

1    Id.  And because DVT "clearly is the type of internal reaction to

2    the normal operation of the aircraft, with no unusual external

3    event," the development of DVT is not itself an accident within the

4    meaning of Article 17.  Rodriguez v Ansett Australia Ltd, 383 F3d

5    914, 917 (9th Cir 2004), cert denied, 544 US 922 (2005).  But DVT-

6    related injuries may be compensable under the Warsaw Convention if

7    caused by an Article 17 accident.  Plaintiffs in this litigation

8    contend that the airline defendants' failure to warn of the risk of

9    DVT constituted an Article 17 accident.  Whether that is correct as

10    a matter of law is the issue to which the court now turns.

11

12                                          B

13          The Supreme Court decision most relevant to this

14    litigation is Olympic Airways v Husain, 540 US 644 (2004).  Husain

15    involved a passenger's fatal reaction to cigarette smoke in the

16    aircraft cabin.  Upon boarding the flight, Dr Hanson and his wife,

17    plaintiff Rubina Husain, realized their seats were located near the

18    economy-class smoking section.  Given Hanson's history of recurrent

19    anaphylactic reactions to cigarette smoke, Husain notified a flight

20    attendant that Hanson was allergic to smoke and requested that

21    Hanson be reseated further away from the smoking area.  Husain

22    repeated her request several times to no avail.  Hanson died in

23    flight, apparently due to a reaction to the ambient cigarette

24    smoke.  Husain's lawsuit followed.

25          Judge Breyer of this district held that the flight

26    attendant's refusal to reseat Hanson constituted an Article 17

27    accident because it was in "blatant disregard of industry standards

28    and airline policies" and therefore "unexpected or unusual" under

United States District Court

For the Northern District of California

<u>Saks</u>.  116 F Supp 2d 1121, 1134 (ND Cal 2000).  The Ninth Circuit affirmed, agreeing that the refusal to reseat Hanson "was unexpected and unusual in light of industry standards, Olympic policy, and the simple nature of Dr Hanson's requested accommodation."  316 F3d 829, 837 (9th Cir 2002).

The Supreme Court affirmed.  Because Olympic did not challenge the lower courts' findings that the flight attendant's refusal to reseat Hanson was unusual or unexpected, the majority, per Justice Thomas, assumed the refusal was unusual or unexpected. <u>Husain</u>, 540 US at 652-53.  The remainder of the opinion rejected Olympic's argument that the flight attendant's behavior was properly treated as an omission rather than an affirmative act and therefore could not qualify as "event or happening" under <u>Saks</u>. The majority first observed that the distinction between action and inaction would be more relevant in cases governed by principles of tort law, which are inapposite to the inquiry whether an Article 17 accident has occurred.  Id at 654.  In any event, the majority opined, "rejection of an explicit request for assistance would be an 'event' or 'happening' under the ordinary and usual definitions of these terms."  Id at 655.

Rather than conclude with the finding that the rejection of Husain's request was an "event," the majority proceeded to refute the broader proposition that inaction cannot constitute an Article 17 accident with the following hypothetical (the "<u>McCaskey</u> hypothetical"):

> Suppose that a passenger on a flight inexplicably collapses and stops breathing and that a medical doctor informs the flight crew that the passenger's life could be saved only if the plane lands within one hour.  Suppose further that it is industry

> standard and airline policy to divert a flight to
> the nearest airport when a passenger otherwise faces
> imminent death.  If the plane is within 30 minutes
> of a suitable airport, but the crew chooses to
> continue its cross-country flight, "the notion that
> this is not an unusual event is staggering."

Id at 656 (quoting <u>McCaskey v Continental Airlines, Inc</u>, 159 F Supp

2d 562, 574 (SD Tex 2001)) (alteration omitted).

This conclusion was confirmed by other provisions of the Warsaw

Convention which "suggest that there is often no distinction

between action and inaction on the issue of ultimate liability."

Id (discussing Article 25 and Article 20(1)).

      For purposes of this litigation, the most significant

aspect of the majority's discussion of inaction is its express

disregard of decisions of intermediate appellate courts of England

and Australia, both of which had concluded that failure to warn of

DVT cannot constitute an Article 17 accident precisely because an

omission cannot be an "event or happening."  See <u>Deep Vein</u>

<u>Thrombosis and Air Travel Group Litig</u>, [2004] QB 234, ¶25 ("I

cannot see, however, how inaction itself can ever properly be

described as an accident.  It is not an event; it is a non-event.

Inaction is the antithesis of an accident."); <u>Qantas Ltd v Povey</u>,

[2003] VSCA 227, ¶17 ("The allegations in substance do no more than

state a failure to do something, and this cannot be characterised

as an event or happening, whatever be the concomitant background to

that failure to warn or advise.").  The majority first stated that

its <u>conclusion</u> was "not inconsistent with" the English and

Australian decisions.  <u>Husain</u>, 540 US at 655 n 9.  But in its next

breath the majority stated that to the extent the "precise

<u>reasoning</u>" of the foreign courts was inconsistent with the

United States District Court

For the Northern District of California

majority's reasoning, "we reject the analysis of those cases for the reasons stated in the body of this opinion."  Id (emphasis added).  The majority noted the factual differences between the cases and the fact that the courts of last resort of the United Kingdom and Australia had yet to speak.  In an unforgiving dissent joined by Justice O'Connor, Justice Scalia rebuked the majority for needlessly placing the United States in conflict with the well-reasoned decisions of sister signatories.  Id at 658-63 (Scalia dissenting).

Since Husain, the courts of last resort of the United Kingdom and Australia have spoken, affirming the decisions and essentially adopting the reasoning of the intermediate courts.  See Deep Vein Thrombosis and Air Travel Litig, [2005] UKHL 72; Povey v Qantas Airways Ltd, [2005] HCA 33.

C

Despite the potential schism between Husain and the DVT decisions abroad, the Fifth and Ninth Circuits have addressed claims for failure to warn of DVT under Article 17, effectively harmonizing the conclusions of sister signatories with the reasoning of Husain.

1

In Blansett v Continental Airlines, Inc, 379 F3d 177 (5th Cir), cert denied, 543 US 1022 (2004), the district court denied Continental's motion to dismiss, holding that the plaintiff stated a claim under Article 17 by alleging that the defendant's "failure to warn of the risk of contracting DVT was an accident because such

failure was an abnormal and unreasonable application of routine procedure, and thus, it was unusual and unexpected."  237 F Supp 2d 747, 751-52 (SD Tex 2002).  The Fifth Circuit, unanimous in all but one respect, reversed.  The panel understood <u>Husain</u> as holding that "<u>some</u> kinds of inaction can constitute an 'accident.'"  <u>Blansett</u>, 379 F3d at 181 (emphasis added).  But the panel drew a distinction between the facts of <u>Husain</u> and the <u>McCaskey</u> hypothetical and the failure to warn of DVT:  "In <u>Husain</u> and the <u>McCaskey</u> hypothetical, unusual circumstances existed to elevate the willing inaction of airline personnel from mere inertia —— from a <u>non-event</u> —— to an event both 'unexpected and unusual.'"  Id (footnote omitted).  This "mere inertia/inertia plus unusual circumstances dichotomy" was not endorsed by one member of the panel.  Id at 181 n 4.

Similar to plaintiffs in this litigation, the Blansetts alternatively argued that the unexpected event occurred not when flight attendants failed to warn of DVT, but rather when Continental policymakers decided not to mandate DVT warnings on Continental flights.  Id at 181.  Although "this decision occurred at a time and place distant from Blansett's flight," the panel found it "appropriate to consider the deliberate perpetuation of company-wide policies as potential 'events' within the context of the individual flights in which they are given effect."  Id.

Proceeding to the question whether Continental's deliberate policy choice was unexpected or unusual, the panel assumed for purposes of appeal that a failure to warn of DVT was a departure from an industry standard.  Although the panel recognized that a departure from an industry standard can constitute an unexpected or unusual event under <u>Husain</u>, it refused to create a

United States District Court

For the Northern District of California

*per se* rule to that effect.  See id at 182 ("Some departures from an 'industry standard' might be qualifying accidents under Article 17, and some may not.").  Turning to the case before it, the Fifth Circuit found nothing unusual or unexpected because (1) "[alt]hough many international carriers in 2001 included DVT warnings, it is undisputed that many did not" and (2) "Continental's battery of warnings was in accord with the policies of the [FAA], which prescribes what warnings airlines should issue to passengers."  Id at 181-82.

2

In <u>Rodriguez v Ansett Australia Ltd</u>, 383 F3d 914 (9th Cir 2004), the Ninth Circuit affirmed summary judgment in favor of the airline on Rodriguez's DVT-based claims.  After concluding that a passenger's development of DVT is not itself an Article 17 accident, id at 917, the panel turned to the failure-to-warn claim.

Rodriguez argued that the failure to warn of DVT presented a situation factually analogous to <u>Husain</u> and <u>Fulop v Malev Hungarian Airlines</u>, 175 F Supp 2d 651 (SDNY 2001), a case that presented facts similar to the <u>McCaskey</u> hypothetical.  The panel found both cases distinguishable:  "Both <u>Fulop</u> and <u>Husain</u> involved a response by a flight crew to the passenger's medical condition.  By contrast, in the instant case, there was no response by the flight crew that may or may not have violated industry standards."  <u>Rodriguez</u>, 383 F3d at 918.

Ultimately, however, the panel affirmed on the ground that Rodriguez "submitted no evidence to raise a genuine issue of material fact as to whether there was either a clear industry

standard or an airline policy at the time regarding DVT warnings."
Id.  The Ninth Circuit expressed neither agreement nor disagreement
with the rationale and holding of <u>Blansett</u>, expressly declined to
address "whether an airline's failure to warn of DVT can constitute
an accident for purposes of Article 17" and confined its holding on
the failure-to-warn claim to the insufficiency of the evidence of
an industry practice.  Id at 919.

3

Following briefing and oral argument on defendants'
motions, the Ninth Circuit rendered decision in <u>Caman v Continental
Airlines, Inc</u>, ___ F3d ___, 2006 WL 2136623 (9th Cir Aug 2, 2006).
Caman sued Continental under the Warsaw Convention for DVT-related
injuries, claiming that Continental's failure to advise him of the
risk of DVT constituted an Article 17 "accident."  The district
court granted summary judgment in favor of Continental and a
unanimous panel of the Ninth Circuit affirmed.

After discussing <u>Saks</u>, <u>Husain</u>, <u>Blansett</u> and <u>Rodriquez</u>,
the panel distinguished Article 17 from Article 20(1), which
provides that a "carrier shall not be liable if he proves that he
and his agents have taken all necessary measures to avoid the
damage or that it was impossible for him or them to take such
measures."  49 Stat 3019.  See also <u>Saks</u>, 470 US at 407 ("The
'accident' requirement of Article 17 is distinct from the defenses
in Article 20(1), both because it is located in a separate article
and because it involves an inquiry into the nature of the event
which <u>caused</u> the injury rather than the care taken by the airline
//

12

to avert the injury.").  The <u>Caman</u> panel reasoned:

> Attributing liability to an air carrier for failing to do all it can to prevent an injury that is inherent in air travel * * * improperly shifts the focus of the inquiry from the nature of the event which caused the injury to the alleged failure of the air carrier to avert the same.  In addition, interpreting the term "accident" to include a failure to warn of a possible risk of flight would incorporate into Article 17 an inquiry that is properly left to analysis under Article 20(1) once it has been established that an accident has occurred.

<u>Caman</u>, 2006 WL 2136623, *4 (citing <u>Husain</u>, 540 US at 649 n 5).

Ultimately, the panel held that failure to warn of DVT is not an "event" for purposes of <u>Saks</u>'s definition of "accident," distinguishing the type of inaction present in <u>Husain</u>.  Id. Specifically, the panel stated that a failure to warn is "an act of <u>omission</u> (inaction that idly allows an unfolding series of events to reach their natural conclusion)" while <u>Husain</u> involved "an act of <u>commission</u> (inaction that produces an effect, result or consequence)."  Id.

<u>Caman</u> is but the most recent example of the growing international consensus among Warsaw signatories that the absence of a DVT warning does not give rise to liability under Article 17. More important, <u>Caman</u> is the law of the Ninth Circuit and therefore binds this court.  And <u>Caman</u> teaches that the failure to provide DVT-related warnings before or during flight is not an "event" and therefore does not qualify as an Article 17 accident, regardless of an industry standard or individual airline policy of providing warnings in light of which the absence of a warning might have been unexpected or unusual.  See <u>Caman</u>, 2006 WL 2136623, *3 n 4. Accordingly, the court need neither consider the proffered evidence

United States District Court
For the Northern District of California

13

United States District Court

For the Northern District of California

of an industry practice or airline-specific policies nor address
defendants' objections to the same.  The court will, however,
address related, but distinct, alternative theories advanced by
plaintiffs of which <u>Caman</u> does not so readily dispose.

III

A

Plaintiffs suggest there is a meaningful difference
between a failure to provide any DVT-related warning and "the
failure of the warnings [d]efendants did elect."  Doc #364 at 21.
In other words, plaintiffs focus not on the lack of a warning, but
the inefficacy of whatever warnings were given.  Plaintiffs
analogize "defective" DVT warnings to the malfunction of a seat-
belt warning light that has been activated by the flight crew but
fails to illuminate because of a faulty bulb.  Id.  The court is of
a different view.

First, it would be strange indeed if the failure to
provide any warning could not give rise to liability under Article
17 while the provision of an ineffective warning could.  Although
deterrence might not be a purpose of Article 17, the court
hesitates to give flight to a theory that creates disincentives for
warning passengers of risks associated with air travel.

Second and more important, plaintiffs' analogy is
imperfect.  It might very well be the case that the failure of a
light bulb to perform as expected would be an Article 17 accident.
But that analysis would not necessarily entail inquiry into what
more the airline could have done to prevent the accident.  The
airline might have chosen only the best lamps, replaced them

14

United States District Court

For the Northern District of California

frequently and, yet, unexpectedly, one burned out.  In the context
of this litigation, however, plaintiffs' repackaged defective
warning theory necessarily seeks to attribute "liability to an air
carrier for failing to do all it can to prevent an injury that is
inherent in air travel."  <u>Caman</u>, 2006 WL 2136623, *4.  Plaintiffs
simply have not demonstrated that their hypothesis is anything but
fault-based.

B

In their opposing memoranda, plaintiffs shift the focus
from the failure to warn of DVT on any given flight to the
airlines' decisions not to give such warnings.  The essence of
plaintiffs' argument is that although an omission on the part of
the flight crew may be too passive to qualify as an "event or
happening," a policy-level "<u>election</u>" not to give such warnings
despite requests by trade associations, among others, is akin to
the flight attendant's refusal to reseat Dr Hanson in <u>Husain</u>.  In
other words, plaintiffs emphasize what happened at the corporate
executive level, not what happened (or did not happen) on board the
flights in question.  No defendant has raised the issue whether
plaintiffs improperly attempt to use summary judgment as a vehicle
to amend their complaints and the court will not raise the issue
*sua sponte*.

Plaintiffs' "election" theory gains no traction in
Article 17, for, on any set of facts, the policy-level decisions
upon which plaintiffs draw a bead would have been too remote in
time and space from the flights in question to give rise to
liability.  The text of Article 17 makes clear that an "accident"

15

United States District Court

For the Northern District of California

must have occurred either on board or in the course of "embarking of disembarking" in order for any injury caused thereby to be compensable under Article 17.  See Prescod v AMR, Inc, 383 F3d 861, 869 (9th Cir 2004) ("[A] passenger's delayed reaction to an Article 17 accident resulting in injury or death is actionable so long as the accident itself took place on board the aircraft or in the course of any operations of embarking or disembarking." (quotations omitted)).  See also Eastern Airlines, Inc v Floyd, 499 US 530, 535-36 (1991) ("[U]nder Article 17, an air carrier is liable for passenger injury only when * * * the accident took place on board the aircraft or in the course of operations of embarking or disembarking.") (dictum).  Whether an accident occurred within the temporal and spatial limitations of Article 17 is a question of law.  See Schmidkunz v Scandinavian Airlines System, 628 F2d 1205, 1207 (9th Cir 1980).

In Maugnie, *supra*, the Ninth Circuit suggested a flexible approach "which requires an assessment of the total circumstances surrounding a passenger's injuries, viewed against the background of the intended meaning of Article 17.  Location of the passenger is but one of several factors to be considered."  Maugnie, 549 F2d at 1262.  See also Day v Trans World Airlines, Inc, 528 F2d 31, 35 (2d Cir 1975) (opining that the Warsaw delegates eschewed "a rigid rule based solely on location of the accident" and "preferred to provide latitude for the courts to consider the factual setting of each case"); Evangelinos v Trans World Airlines, Inc, 550 F2d 152, 155 (3d Cir 1977) (en banc) (stating that "a test that relies upon location alone is both too arbitrary and too specific to have broad application, since almost every situation and every airport is

16

United States District Court

For the Northern District of California

different," and prescribing a three-factor analysis to determine whether an accident occurs in the process of embarking or disembarking).  But see <u>McCarthy</u>, 56 F3d at 316 ("The terms 'embarking' and 'disembarking' are not infinitely elastic, and we believe it is quite probable that, when the occasion to interpret those terms arises, the Court will prove to be similarly restrained in defining them.").

Applying this test, the Ninth Circuit in <u>Maugnie</u> concluded that a passenger who slipped and fell in a hallway between the airline gate and the center of the terminal could not recover because by the time of the accident she had completed the process of disembarking her flight.  <u>Maugnie</u>, 549 F2d at 1257, 1262.  The panel found dispositive the facts that the passenger (1) had proceeded through a boarding lounge to a common corridor that was neither owned nor leased by the air carrier and (2) was no longer under the control of the air carrier.  Id at 1262.  Applying <u>Maugnie</u>'s flexible approach in a subsequent case that presented a factual situation at the opposite end of the embarking-to-disembarking spatial-temporal spectrum, the Ninth Circuit found that an accident occurred before the process of embarking because the passenger had not received her boarding pass and was not "imminently" preparing to board the plane or under the direction of air carrier personnel.  <u>Schmidkunz</u>, 628 F2d at 1207.

Whether a policy-level decision, which necessarily occurs well before the flight in which it is given effect, can give rise to liability under Article 17 appears to be a question of first impression.  Cf <u>Lathigra v British Airways PLC</u>, 41 F3d 535, 539 (9th Cir 1994) (declining to decide, in the pre-<u>Tseng</u> landscape,

United States District Court

For the Northern District of California

1   whether "decisions (e g, changes in schedules and frequencies)

2   necessarily occurring hours or days before departure" are beyond

3   the scope of the Warsaw Convention).  But elastic as the Maugnie

4   approach may be, the concept of embarking an aircraft simply cannot

5   be stretched so far as to encompass plaintiffs' theory.  Clearly,

6   under any set of facts, in terms of location, control and any other

7   salient consideration that would properly comprise the "totality of

8   the circumstances" to be considered under Maugnie, a policy-level

9   decision on the part of airlines not to provide DVT warnings on

10  board would, by definition, have occurred at a time and place so

11  far distant from any particular flight in which the policy was

12  given effect that it could not have taken place on board or in the

13  process of embarking the aircraft.

14         The Fifth Circuit saw matters differently in Blansett.

15  There, the Blansetts recognized that Continental's decision to give

16  DVT warnings was made "at a time and place distant" from the flight

17  but nonetheless invoked Saks's instruction that the definition of

18  "accident" be applied flexibly in light of all the circumstances.

19  Blansett, 379 F3d at 181 (citing Saks, 470 US at 405).  Without

20  expressly subscribing to the Blansetts' proffered Saks-derived

21  rationale (but without espousing a different legal justification),

22  the Fifth Circuit found it "appropriate to consider the deliberate

23  perpetuation of company-wide policies as potential 'events' within

24  the context of the individual flights in which they are given

25  effect."  Id.

26         With all the respect certainly due the Fifth Circuit, the

27  court disagrees.  No doubt courts are to take a pliable stance

28  toward the questions whether an accident occurred at all and, if

United States District Court

For the Northern District of California

so, whether that accident occurred while the passenger was on board or in the process of embarking or disembarking the aircraft.  But <u>Blansett</u> all but collapses those two analytically distinct inquiries into one, thereby rendering nugatory the plain language —— and, by the same token, significantly expanding the scope —— of Article 17.  Under <u>Blansett</u>, so long as (1) an unexpected or unusual event or happening external to the passenger occurs somewhere in the causal chain, (2) there is some identifiable link in the chain between the aforementioned "accident" and the passenger's injury and (3) that link can be plotted somewhere along the embarking-to-disembarking spectrum, then liability attaches regardless whether the accident itself occurred on board or in the process of embarking or disembarking —— or, put another way, regardless whether the link itself was an accident.  A flexible approach is one thing; doctrinal prolapsus is quite another.  And neither the text of the Warsaw Convention, the ratification proceedings nor the prior case law suggest that Article 17 properly can be used as a vehicle to regulate air carriers' decisionmaking processes that themselves bear no resemblance whatsoever to an accident that occurs on board an aircraft or in proximity thereto.

To the court's surprise, not one of the dozen-plus airline defendants has questioned whether a policy-level decision can give rise to liability in light of its remote locus in time and space vis-à-vis any particular flight.  Perhaps defendants preferred to ignore the obvious rather than cast a shadow upon <u>Blansett</u>.  It was not until the last footnote of the last brief submitted on the present motions that <u>plaintiffs</u> broached the issue, seeking the only refuge that <u>Blansett</u> could afford them.

**United States District Court**

For the Northern District of California

1  See Doc #461 at 5 n 7.

2         À la <u>Blansett</u>, plaintiffs contend that the policy
3  decisions preceded the actual failures to warn on board individual
4  flights "shows no more than that the 'unusual or unexpected'
5  failure to warn effectively on the flight was part of a larger
6  causal chain that extended beyond the parameters of embarking and
7  disembarking."  Id.  But plaintiffs essentially concede that the
8  policy decisions were not made on board or in the course of
9  embarking or disembarking within the meaning of Article 17.  And in
10 their next breath, plaintiffs further admit that an unusual or
11 unexpected event must occur "between embarking and disembarking" in
12 order for liability to attach under Article 17.  Id.  At the end of
13 the day, however, plaintiffs do not, and cannot, point to an
14 injury-causing event external to them that occurred on board or in
15 the process of embarking or disembarking.

16        In addition to <u>Blansett</u>, plaintiffs cite <u>Waxman v CIS</u>
17 <u>Mexicana De Avacion</u>, 13 F Supp 2d 508 (SDNY 1998).  There, Judge
18 Cote concluded that the failure to remove a hypodermic needle from
19 a seat back was "an unusual, unexpected departure from ordinary
20 procedures" and therefore qualified as an accident.  Id at 512.
21 Putting aside that this rationale is on its face at odds with
22 <u>Caman</u>, <u>Waxman</u> is inapposite because Judge Cote apparently assumed
23 that the accident occurred either on board or in the process of
24 embarking or disembarking without discussing the matter.  Again,
25 that question is distinct from the question whether an accident
26 occurred *vel non*.  And Judge Cote's assumption was, of course,
27 quite reasonable given that the failure to remove the needle from
28 the seat back necessarily occurred on board the aircraft.

1    The court concludes that the policy decisions at which
2    plaintiffs now take aim could not have occurred in connection with
3    plaintiffs' flights or the process embarking or disembarking the
4    same.  Accordingly, regardless whether such decisions might qualify
5    as an unexpected or unusual event or happening under <u>Saks</u>, they
6    could not give rise to liability under Article 17.

7    It bears mention that the question of liability under the
8    Warsaw Convention is distinct from the question whether the Warsaw
9    Convention applies in the first place.  See, for example, <u>Acevedo-</u>
10   <u>Reinoso v Iberia Líneas Aéreas de España SA</u>, 449 F3d 7, 13 (1st Cir
11   2006) (finding that "the district court erroneously conflated the
12   applicability of the Convention with liability under the
13   Convention").  As already discussed, <u>Tseng</u> makes clear that the
14   Warsaw Convention applies to claims arising from an <u>injury</u> that
15   occurred either on board or in the course of embarking or
16   disembarking.  Although the question whether an injury-causing
17   <u>accident</u> occurred on board or in the course of embarking or
18   disembarking bears upon liability, it is analytically distinct from
19   the antecedent question whether the Convention applies (thereby
20   preempting claims based on local law).

21

22                              IV

23   The only question remaining is whether plaintiffs have
24   justified further discovery.

25   On April 20, 2005, the court limited discovery for
26   purposes of the present motions to evidence of an industry practice
27   (specifically, "[a]ll documents (regardless of source) in the
28   airline defendant's possession at the time of plaintiff's flight

21

referring or relating to <u>any</u> airline's <u>actual practices</u> concerning warning passengers of the risks of DVT or the risks associated with prolonged immobility in aircraft") and individual airline policies (specifically, "[a]ll documents referring or relating to the individual airline's <u>actual</u> practices or policies concerning warning" its passengers, pilots and crewmembers "of the risks of DVT or the risks associated with prolonged immobility in aircraft"). Doc #165 at 6-7. The court fashioned these discovery limitations in light of <u>Rodriguez</u>'s (1) focus upon the lack of an industry practice or individual policy of providing DVT-related warnings and (2) rejection of "negligence-type" evidence. See <u>Rodriguez</u>, 383 F3d at 918-19.

Plaintiffs now contend in Rule 56(f) affidavits that this discovery is insufficient and seek to continue summary judgment proceedings pending additional discovery. Doc #365 (Danko Decl). See also Doc #364 at 22-25. "The party seeking a Rule 56(f) continuance should demonstrate that: (1) it has set forth in affidavit form the specific facts that it hopes to elicit from further discovery; (2) the facts sought actually exist; and (3) these sought-after facts are essential to resist the summary judgment motion." <u>In re Deep Vein Thrombosis</u>, 356 F Supp 2d 1055, 1060 (ND Cal 2005) (citing <u>California v Campbell</u>, 138 F3d 772, 779 (9th Cir 1998)).

According to the declaration of Michael Danko, plaintiffs seek discovery pertaining to

> the actual policy and procedure of defendants concerning warning passengers of the risks of DVT; whether or not that policy or procedure was followed by defendants; communications between each defendant and other airlines and airline industry associations

1
2
3
4
5
6

> concerning the risks of airline flight and DVT,
> recommendations to warn passengers about the risks
> of DVT from internal and external sources;
> documentation in defendants' files concerning the
> efficacy of advising passengers to perform DVT
> preventative exercises; prior warnings given related
> to DVT by defendant but then withdrawn for monetary
> reasons and/or collusion with other airlines; and
> the recommendations of defendants' own in-house
> health experts to provide the necessary warnings and
> instructions.

7  Danko Decl at 3.

8  Plaintiffs submit that apart from industry practice or individual

9  airline policies, the foregoing evidence is reasonably likely to

10 show that (1) "defendants disregarded requests to effectively warn

11 about DVT," (2) "defendants' ineffective DVT warnings resulted from

12 a cover-up of the dangers of DVT" and (3) "defendants' discussions

13 of DVT risks were so extensive and informed as to render their

14 failure to effectively warn the functional equivalent * * * of the

15 failure to respond to requests for assistance in issue in Husain."

16 Id at 4.

17          The discovery plaintiffs seek is not essential to oppose

18 the present motions.  First of all, some of the discovery

19 plaintiffs now seek was encompassed by the discovery that has been

20 allowed regarding industry practice and individual airline policy.

21 To the extent plaintiffs believe that defendants have not been

22 forthcoming with documents that fall into the categories described

23 in the court's discovery order, Caman's disregard of such evidence

24 moots plaintiffs' complaint.  See Caman, 2006 WL 2136623, *3 n 4.

25 For this same reason, the discovery requested in the declarations

26 of Brenda Posada and James Furman related to airlines' involvement

27 in the International Air Transport Association (IATA) and the

28 International Civil Aviation Organization (ICAO) — "two

United States District Court

For the Northern District of California

23

United States District Court

For the Northern District of California

international entities that set the industry standard" —— would not better equip plaintiffs to oppose the present motions.  See Doc ##350 ¶3, 353 ¶9, 354 ¶8 (Posada Decls); Doc #361 ¶14 (Furman Decl).

Second, even assuming that the discovery plaintiffs seek will yield facts that support a theory of "cover-up" or a "functional equivalent" of the scenario in <u>Husain</u>, to the extent such a theory is not premised on what the airlines could or should have done (as opposed to the occurrence of an accident that occurred on board or in the process of embarking or disembarking), plaintiffs' theory would nonetheless fail as a matter of law for the reasons discussed in part III(B) of this order.

V

In sum, plaintiffs' Rule 56(f) applications are DENIED. The airline defendants' motions for summary judgment are GRANTED.

This order affects only the named airline defendant(s) in each of the above-captioned Warsaw cases.  Further, this order does not affect claims against Delta Airlines, Inc, Northwest Airlines, Inc, or ATA Airlines, Inc.  See Doc ##54, 254, 258-266.  See also Doc #311 at 3 n 4 ("[D]efendants Delta, Northwest and ATA do not seek any affirmative relief by this motion because of the applicability of automatic stay orders relating to their respective bankruptcy proceedings.").

Pursuant to FRCP 54(b), the court finds that there is no just reason to delay entry of judgment in favor of any airline defendant that is <u>both</u> a party to the present motions <u>and</u> against which the only Article 17 accidents alleged are the onset of DVT or

United States District Court

For the Northern District of California

1   the absence or insufficiency of a warning regarding DVT or policy-

2   level decisions regarding the same.  Accordingly, the clerk is

3   DIRECTED to enter judgment in favor of the airline defendants

4   except that the clerk shall not enter judgment (1) as to Delta,

5   Northwest and ATA and (2) in the following five actions:  03-1929

6   (Dabulis), 04-3831 (Richelet), 04-3953 (Halterman), 04-4700

7   (Phillips) and 04-4896 (Menditto).  In any action in which the

8   clerk enters judgment in favor of an airline defendant (with the

9   above-noted exceptions) and in which no other active defendant is

10  named, the clerk is further DIRECTED to close the file and

11  terminate all motions.

12

13          SO ORDERED.

14

15

16          VAUGHN R WALKER

17          United States District Chief Judge

18

19

20

21

22

23

24

25

26

27

28